J-A28040-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.N.E.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2018 EDA 2022 |

Appeal from the Decree Entered July 22, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000095-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: A.N.I.-E.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2019 EDA 2022 |

Appeal from the Decree Entered July 22, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000412-2021

BEFORE:  PANELLA, P.J., LAZARUS, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED MARCH 6, 2023**

E.S. ("Father") appeals from the decrees involuntarily terminating his parental rights to his daughter, A.N.E.H., born in January of 2016, and his son, A.N.I.-E.S., born in June of 2019 (collectively, "the Children").  We affirm.

The relevant factual and procedural history of this case is as follows. The Philadelphia Department of Human Services ("DHS") opened a case for in-home services for this family in January 2019, following its validation of a

report alleging that the Children's mother was in a car accident with three-year-old A.N.E.H., who had not been "strapped in" in the car and suffered a hematoma. *See* N.T., 7/22/22, at 14. In April 2019, Father was arrested and charged with murder and related offenses. *See id*. at 15-16. The next month, the mother was incarcerated, following a probation violation, and the court placed A.N.E.H. in the custody of DHS. *See id*. at 16. A.N.E.H. immediately began residing in kinship care with her paternal grandmother. *See id*. The court adjudicated A.N.E.H. dependent on May 21, 2019.

A.N.I.-E.S. was born with opiates in his system during the mother's incarceration. *See id*. at 17. The court adjudicated A.N.I.-E.S. dependent on June 24, 2019. The court placed A.N.I.-E.S. in the protective custody of DHS, which then placed him with his paternal cousin. *See id*. at 17-18. In September 2019, A.N.I.-E.S. began residing in kinship care with A.N.E.H. and their paternal grandmother. *See id*. at 18.

The Community Umbrella Agency ("CUA") established single case plan objectives for Father, to be completed during his incarceration, with the goal being reunification. The objectives included participating in a parenting program, mental health and drug and alcohol services, and visitation with the Children. *See id*. at 20. CUA case managers visited Father in prison and provided him with his permanency objectives. *See id*. at 19. With respect to visitation, the court ordered one hour in-person visits with the Children at the prison. *See id*. at 20. The parties agreed to switch from in-person to virtual

and/or telephone visits "due to the [C]hildren being upset during" prison visits. *Id*. Father had daily contact by telephone or video with the Children residing in kinship care with their paternal grandmother. *See id*. at 30-31. However, Father ultimately complied with only one objective while his criminal charges were pending, namely, phone/virtual visitation.

DHS filed a petition for the involuntary termination of Father's parental rights to A.N.E.H. on February 19, 2021, and A.N.I.-E.S. on July 22, 2021.[1] The trial court held an evidentiary hearing on July 22, 2022, during which DHS presented the testimony of Jessica Estevez, a CUA case manager. Father testified on his own behalf from prison *via* videoconferencing.[2] By the time of the subject proceeding, A.N.E.H. was six years old and had been in placement for more than three years. A.N.I.-E.S. was three years old and had been in placement his entire life. As noted above, Father complied with just one of his objectives. The record is unclear as to whether any of these programs

---

[1] DHS also petitioned for the involuntary termination of the parental rights of the Children's mother. The trial court held the petition with respect to the Children's mother in abeyance. *See id*. at 11-12. There is no indication in the record that the mother's parental rights have been terminated.

[2] The Children, then ages six and three, were represented by separate legal and best interests counsel in accordance with 23 Pa.C.S.A. § 2313(a). *See In re K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) (holding that appellate courts "should engage in *sua sponte* review to determine if [trial] courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with [s]ubsection 2313(a)"). Both legal and best interests counsel agreed that Father's parental rights should be terminated. *See*, *e.g.*, N.T., 7/22/22, at 37-38.

were discontinued following advent of the COVID-19 pandemic, and if so, for how long. *See*, *e.g.*, N.T., 7/22/22, at 29-30 (Ms. Estevez testifying that she was unsure about whether the programs were discontinued, and, if so, when they restarted). Father, for his part, testified to his belief that the programs had ceased during the pandemic, but he was unaware whether the programs had since re-started and were available to him at the prison. *See id*. at 34. Father provided no explanation for why he did not engage in and/or complete the programs prior to the pandemic, nor did he assert that he had taken any steps to inquire about whether these programs were available post-pandemic.

At the conclusion of the hearing on July 22, 2022, the trial court involuntarily terminated Father's parental rights to the Children.[3] Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. The trial court complied with Rule 1925(a).[4]

Father raises the following issues for our review:

1.  Did the [t]rial judge rule in error that [DHS] me[t] its burden of proof that Father's parental rights to [the C]hildren be terminated[?]

---

[3] With respect to A.N.I.-E.S., the trial court also involuntarily terminated the parental rights of any unknown father. *See* N.T., 7/22/22, at 41.

[4] On August 23, 2022, the trial court notified this Court, pursuant to Rule 1925(a), that its rationale appears of record at the conclusion of the evidentiary hearing.

2.    Did the trial judge rule in error that the termination [of] Father's rights would best serve the needs and welfare of the [C]hildren[?]

Father's Brief at 5.

Our standard of review is as follows:

[I]n cases involving involuntary termination of parental rights[, our review] is limited to determining whether the trial court's determination is supported by competent evidence. When applying this standard of review, an appellate court must accept the findings of fact and credibility determinations of the trial court if they are supported by evidence of record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion. An abuse of discretion is found where there is a demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. It matters not that an appellate court might have reached a different conclusion, as it is well-established that absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand.

*In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021) (internal citations omitted).

Pennsylvania's Adoption Act ("the Act") governs involuntary termination of parental rights proceedings. *See* 23 Pa.C.S.A. §§ 2101-2938. Subsection 2511(a) provides grounds for the involuntary termination of parental rights. If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in subsection (a), the court must then consider whether termination would best serve the child under subsection (b). *See id*. § 2511(b). This Court need only agree with one of

the grounds set forth in subsection (a) to affirm, provided subsection (b) is also satisfied. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004).

Here, the trial court involuntarily terminated Father's parental rights to the Children pursuant to section 2511(a)(1), (2), (5), and (b). As we need only agree with the trial court's determination as to any one section of 2511(a), we limit our discussion to sections 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * * *
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

In his first issue, Father contends that the trial court erred in finding that grounds existed to terminate his parental rights pursuant to section 2511(a)(2). The grounds for termination of parental rights under section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include acts of refusal and incapacity to perform parental duties. *See In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021). Section 2511(a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (internal citation and emphasis omitted). We have long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017). At a termination hearing, the trial court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to co-operate with the agency or take advantage of available services during the dependency proceedings. *See In re S.C.*, 247 A.3d at 1105.

In *In re Adoption of S.P.*, our Supreme Court addressed the relevance of incarceration in termination decisions under section 2511(a)(2), holding,

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under

[section] 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

47 A.3d 817, 828 (Pa. 2012).

Father asserts that the trial court erred in finding grounds for involuntary termination of his parental rights, given he maintained daily contact with the Children, though he was unable to complete his other permanency objectives because "the programs were shut down at the prison" during the COVID-19 pandemic. Father's Brief at 11-12.

The trial court considered Father's first issue and determined it lacked merit. At the conclusion of the hearing, the trial court explained:

> The testimony reflects that these children have been in care for [approximately thirty] months.
>
> * * * *
>
> Father has been incarcerated since the children were placed. In[-]person visits were attempted, but unfortunately the in[-]person visits were upsetting the children and had to be switched to virtual. Single case plan objectives were established to achieve the goal of reunification.
>
> The testimony reflects that Father was able to complete one objective of those that were put in place[, *i.e.*, the phone/virtual visitation]. I find that the circumstances that necessitated placement have not been alleviated and will not be alleviated in a reasonable period of time.

N.T., 7/22/22, at 39-40.

Following our review, we discern no abuse of discretion by the trial court finding that grounds existed to terminate Father's parental rights pursuant to

- 8 -

section 2511(a)(2). We note that Father was incarcerated in April of 2019, which was approximately one year prior to the COVID-19 pandemic. A case manager visited him in jail and provided him with his single case plan objectives, including, but not limited to, completing parenting classes, mental health services, and drug and alcohol services. *See id*. at 19-20. Ms. Estevez, the CUA caseworker, testified that while Father started parenting classes at an unspecified time in prison, he was discharged from the class for fighting. *See id*. at 21. Ms. Estevez further testified that Father never engaged mental health or drug and alcohol services. *See id*.[5] The record thus demonstrates Father's repeated and continued incapacity to engage in, or complete, his objectives during his incarceration. This caused the Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being for approximately thirty months. The record further supports the trial court's conclusion that Father's incapacity, neglect, or

_____

[5] As we noted above, the record is unclear as to whether any of these programs were discontinued following advent of the COVID-19 pandemic, and if so, for how long. *See*, *e.g.*, *id*. at 29-30, 34. However, it was Father's responsibility to make diligent efforts toward assuming his parental responsibilities, and thus, to make reasonable inquiries about whether these programs, assuming they were discontinued, had resumed. *See In re Adoption of M.A.B.*, 166 A.3d at 443 (noting that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities.). We further note that Father provided no explanation for why he did not engage in and/or complete the programs prior to the pandemic or assert that he took any steps post-pandemic to investigate whether these programs were open.

refusal cannot or will not be remedied.[6] *See Interest of K.M.W.*, 238 A.3d 465, 475 (Pa. Super. 2020) (affirming the trial court's finding of grounds for termination under subsection (a)(2) where the intermittently incarcerated mother "remained non-compliant with court-ordered tri-weekly drug screens, non-cooperative with the Agency, and had not progressed past supervised visitation with [the c]hild while [the c]hild remained in placement for over 40 months"); *see also In re S.C.*, 247 A.3d at 1105 (noting that a parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous); *see also In re Adoption of M.A.B.*, 166 A.3d at 443 (providing that "[a] parent has a duty to work towards reunification by

---

[6] We observe, moreover, that Ms. Estevez opined that Father's reunification with the Children is not viable. *See* N.T., 7/22/22, at 22. Regarding Father's release date, Ms. Estevez testified that his murder charges were still pending at the time of the involuntary termination hearing, which was then approximately three years after the Children's placement. *Id*. at 22. She further explained, "Father remains incarcerated. We do not know a release date. And he hasn't completed any other objectives." *Id*. Father confirmed that he was proceeding to trial on the charges, and that his next court date was scheduled for November of 2022. *See id*. at 33-34. The record contains the docket number for Father's criminal case, and a search of the publicly available docket indicates Father was acquitted of his murder charge, but convicted of hindering apprehension or prosecution, a third-degree felony. *See* Docket, CP-51-CR-5410-2019; *see also* 18 Pa.C.S.A. 5105(a)(1). The docket also indicates, as of this writing, that Father's sentencing is scheduled for March 2023. However, the Children cannot wait for permanency and stability any longer. *See In re Adoption of C.D.R.*, 111 A.3d 1212, 1220 (Pa. Super. 2015) (stating that this Court cannot and will not subordinate indefinitely a child's need for permanency and stability to a parent's claims of progress and hope for the future).

- 10 -

cooperating with the rehabilitative services necessary for him or her to be able to perform parental duties and responsibilities").

In his second issue, Father contends that the trial court abused its discretion by finding that termination of his parental rights was in the Children's best interest pursuant to section 2511(b). Regarding the section 2511(b) best interest analysis, this Court has explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the [trial] court must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship. . . ..
>
> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (internal citations, quotations, brackets, and indentation omitted). Furthermore, our Supreme Court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013). In weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in

mind." *Id*. at 269. Children "are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

Father argues the trial court erred in finding pursuant to section 2511(b) that termination of his parental rights served the best interest of the Children, since he was maintaining contact with them and they had a relationship. *See* Father's Brief at 16-17. He further maintains A.N.E.H. did not "understand the ramifications of adoption," and was therefore unable to express a preference about the matter. *See id*. According to Father, DHS was required to take further steps to explain to A.N.E.H. the adoption process. *See id*. at 17.

The trial court considered Father's second issue and concluded it lacked merit:

> [The t]estimony reflects that there is no bond with Father for either of the [C]hildren . . . no parental bond. For [A.N.I.-E.S.], [Father] is a voice on the phone. And for [A.N.E.H.], the testimony reflects that she does acknowledge him as Father, but there is no parental bond with her either. She refers to the paternal grandmother as mother. The bond is with the paternal grandmother.
>
> I find that no irreparable harm would be suffered if parental rights are terminated. Both children look to their paternal grandmother to meet their needs, to find love, as well as care. Security and safety are provided by her. These children need permanency.
>
> I find it's in their best interest to be freed for adoption . . ..

N.T., 7/22/22, at 40.

- 12 -

We conclude the trial court did not abuse its discretion in determining that terminating Father's parental rights serves the Children's developmental, physical, and emotional needs and welfare pursuant to section 2511(b). While there is no dispute that Father had daily contact by telephone or video with the Children residing in kinship care with their paternal grandmother, *see id*. at 30-31, Ms. Estevez opined, nevertheless, that no parent-child bond existed between Father and the Children. *See id*. at 30. Ms. Estevez described the interaction between the younger child, A.N.I.-E.S.—then three years old—, and Father as "the voice that he knows via the phone." *Id*. at 23. With respect to A.N.E.H.—then six years old—, Ms. Estevez testified that she acknowledges Father as her father, but that A.N.E.H.'s only interaction with Father is by the telephone, and she does not share a parental bond with him. *Id*. Rather, Ms. Estevez testified that both A.N.I.-E.S. and A.N.E.H. share a parental bond with their paternal grandmother. *Id*. at 25, 26. Ms. Estevez testified that the Children's paternal grandmother is a pre-adoptive resource, and, because the Children look to her "for love, care, and day to day needs," they will not suffer any irreparable harm if Father's parental rights are terminated. *Id*. at 23-24, 26. Further, to the extent Father argues that the court abused its discretion under section 2511(b) because the CUA caseworker did not explain the possibility of adoption to A.N.E.H., Father provides no legal authority to support his claim. In any event, the trial court properly appointed counsel to represent the Children's best, and legal, interests pursuant to

section 2313(a). A.N.E.H.'s guardian *ad litem* agreed that termination of Father's parental rights was in A.N.E.H.'s best interest. ***See*** N.T., 7/22/22, at 37-38. Further, while A.N.E.H.'s legal counsel concluded that A.N.E.H. was unable to comprehend what adoption entailed, and therefore unable to express a preference, her legal counsel "indicated that she referred to paternal grandmother as mother." ***Id***. at 38. Given this evidence, we conclude the trial court did not abuse its discretion in finding that that the termination of Father's parental rights was in the Children's best interest.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/6/2023